May it please the court, counsel. My name is Art Stevens and I represent Mr. Koepke in this appeal from a denial at the agency level of the Social Security Administration and then a denial at the Federal District Court level. This is a really interesting case because it presents a unique issue, I think, involving evaluation of pain where you have an individual who seeks pain medication and becomes tolerant to such medication and has a series of treatment with a number of doctors, all of whom believe his symptoms, all of whom believe the intensity and severity of his symptoms, and we believe that the error here was, first error, was that his credibility was discredited because these things such as protocols of him being terminated from treatment, for example, things of this sort, were construed as credibility issues where really they should be viewed as medical issues. I can understand situations, Your Honors, where there's drug-seeking behavior and one would look at a set of facts and say, gee, this person doesn't have much wrong with him. He's seeking drugs. You'd think of the physicians kicking that person out and not providing ongoing drugs. In this case, uniquely, and I tried really hard to kind of give you a good forensic story at the beginning of my appellate's brief, this gentleman would go in, seek treatment. Initially, he was with a PA who was a bit over that physician nurse's head, I think. There were some conversations about misusing drugs. Ongoing referrals to specialists of all kinds occurred. He saw a neurologist, orthopedic spine surgeons. He saw doctors in the context of his diabetes and his peripheral neuropathies of his feet. And finally, after a number of times, he got to an actual pain specialist, Dr. Sills, in the case, who took over his treatment. And Dr. Sills verified that there was a discogenic origin for this man's pain. The etiology wasn't direct herniated disc or nerve root compression, but was very real. And the point is, all of the doctors that were sort of directing this case toward ultimately Dr. Sills believed my client. None of them questioned his credibility. We don't dispute that there were some comments in the record about him losing or having to go to another practice. But if you look at the juncture of each treatment ending, you're going to see that the doctors, not only if my client had been misusing his medications or doubling up on them, well, there would be a scolding, and then the doctors would go ahead and essentially agree with my client by giving him more medications or doubling those same doses to what the claimant was taking, what my client was taking. So in a sense, that behavior by the physicians shows that they believed in the severity and the intensity and the reality of Mr. Kepke's symptoms. So what happened here was the claimant's credibility was discredited. So that being the case, the judge obviously didn't take into account his testimony. And where there's a lack of evidence of malingering, which I would submit is an actual it's not just a pejorative term, there's an absence of such malingering in this record, then there needs to be clear and convincing substantial evidence of a clear and convincing reason to reject the claimant's testimony. And I've always thought or I learned that clear and convincing evidence as a standard meant that you really can't sit there and scratch your head too hard when you're thinking about it. It's getting to you. Kennedy. How many doctors did your client go through who would discharge him for gaming the system to get more drugs? Well, the doctors that would say he – if you're going to say he gamed the system to get more drugs, there were three terminations. But at the end of those terminations, the doctors prescribed more medications for him and then sent him on to another doctor. To another doctor. Well, essentially what I'm saying is if they were – if he were gaming the system and they believed he was gaming the system, they would not have endorsed his own need for these drugs and given him more. And what the record would show is early on in this process, I think with the second or third doctor, Dr. Pilcher, there were honest discussions between my client and the physician about how there was a tolerance that had been built up. And so what I think is, is that it's not clear and convincing evidence or substantial evidence of a clear and convincing reason to discredit his testimony where essentially, to some degree, it's iatrogenic. I mean, you've got doctor-promoted addiction or assisted addiction, and my client takes the hit because they can't figure him out. He is a – he is a problem. They don't quite know what they have. By the time he gets to Dr. Sills, there's clarity. And – but many of the doctors are dealing with his spinal problems. At the end of his treatment, his diabetes and the peripheral neuropathies of his feet had become quite significant. Those doctors, Dr. Bombach, I believe was a neurologist, treated him with methadone. Dr. Bombach did not question the severity of his pain. And that raises the – one of the issues. Essentially, the credibility rejection of the claimant's testimony, there was discussion in the record by a nurse, Scursa, I think her name was, who had talked about the severe symptoms of my client's pain. And the judge tended to reject the reality of the peripheral neuropathy pain, despite numerous physicians prescribing medications up to and including oxycontin, oxy – I believe oxycodone, as well as methadone, which when you're on methadone, you're on a pretty significant drug. Because one of the electrical studies referred to the term mild. And I'd just like to remind your honors that mild multiple sclerosis is pretty severe. Mild cancer is pretty severe, if there is such a thing as mild cancer. So the term mild, I believe, is not something that should be used to determine that this – these peripheral neuropathies were insignificant. Indeed, the record would show, I think, that they were quite substantial. I only saw the word mild in reference to the peripheral neuropathy that you're speaking of now. And I only saw the word severe in reference to the degenerative disc disease in your client's spine. Am I correct? Right. I think – well, I don't know if an adjective was attributed to the peripheral neuropathies. But my question really goes to the spinal injury. The spinal condition involves non-compressive spinal degenerative disease involving numerous levels of the spine. I know what it is. My question is, I read the record, counsel, to be – I don't mean to cut you off, but I know your minutes are ticking away. I know. I read the record to tell me that there were X-rays and MRIs that were all in agreement that your client had severe degenerative disc disease in his spine. Is that right? That's correct. And I would like to – So my next question – that's all right. My next question is, I don't think the docs ever disagreed about that. Did they all agree that he was in pain because of his back injury? Well, that's what I've written in the brief throughout, is that every single doctor in this case believed my client, provided medication to my client. They scolded him if they thought he was misusing drugs, but then – Okay. So this is a really important point to me.  When you say that they all believed your client, I get that from reading between the lines, that they had objective indication of his spinal condition. Exactly. They were scolding him because he was misusing drugs, because I think, as Judge Goodwin described, this speaks of gaming the system to get more narcotic pain medication, but they kept giving it to him because they believed he was in pain, whether he was addicted or not. But I just want to give you a chance to respond to that, because I only get that from reading between the lines. I don't see a statement from physicians saying this man is in serious pain. Well, I can't understand how he wouldn't be if they were giving him the most powerful drugs available. Okay. So I'm going to – He was described to be in intractable pain, I believe, by Dr. Pilcher. So I'm taking this as a yes, that I get that between – by reading between the lines that they, although scolded him, continued to give him pain medication. Yes. And that's why we know that they believed he was in pain. Yes. And there were terms such as intractable used in some of the charts. Dr. Pilcher said that. I believe it was Pilcher. Yes, Your Honor. Okay. Thank you. And so the fact is, is that he – and there are other times, if you look at the record, where the compliance was noted. The other thing is there was candor between him and a number of his physicians. He would talk to them. He knew he was – he had a tolerance and that there was an addiction. There were points where he was concerned about that. I dealt with a couple of factual discrepancies that are in my brief regarding the notion that with one of the doctors, he had actually violated the policy of getting another prescription when he was on methadone. And the fact is, is that he had been taken off the methadone and was on another drug. I don't really want to argue those technicalities. I just want to kind of – I just want to give you the overview here. So the question then is, is it clear and convincing – is it substantial evidence of clear and convincing reasons to discredit this man's – his testimony where he basically testified that he had to lie down frequently, had to elevate his legs. Based on those particular limitations, vocational testimony found him to be unable to engage in any gainful employment. The second – another issue in this case has to do with his physical capacities evaluation, which is a little bit confusing. And the confusion is even evidenced by Judge Hogan's decision in which he – he notes that the ALJ relied upon a physical capacity evaluation that allowed my client to sit, stand, or walk only six hours in an eight-hour day, but then affirmed the denial. Well, that in and of itself is a mistake on the part of all due respect to the good Judge Hogan. That's – that's a mistake in the sense that six hours is not an eight-hour day. I would cite you to – Well, people can do some work even though they can't stand up for six – more than six hours. They can do some work sitting down or lying down. That's correct, Your Honor, but the physical capacities evaluation of record here basically limits the person to less than, you know, four to five hours a day, the one that was in the record. And then what Judge Hogan stated was – extract of Record 535, Judge Hogan stated the ALJ found, consistent with the physical capacities evaluation, that plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, et cetera, sit, stand, and walk six hours in an eight-hour work day. What – what that's telling me is the sit, stand, and walk, which is basically what you do at work, was limited to six, which is already less than a full-time substantial job. It's not – Well, what was the defect in the hypothetical question to the vocational expert? I believe, well, the judge offered his own hypothetical of a light work full-time job where the claimant could do something light with, I think, the ability to change positions and move around and things of that sort. But it was an eight-hour-a-day job. The defect would be that it didn't represent the actual limitations of the claimant. If the claimant's testimony is credited in this case and you don't find that these – you look at the junctures of his treatment between each doctor and you look, the relationship isn't all that negative. I mean, the doctors are frustrated with him. They move him down to someone else. They're not that – it's – they're not that frustrated with him, and they tend to believe him. One thing I did want to mention while I have a minute is the ruling 96.7 is really on point here. It talks about persistence. If a patient persistently seeks treatment over and over, seeks different modalities of treatment, goes to different specialists as this man has, that actually is to enhance credibility and not detract credibility. And the defendant has not ever responded to that in their brief, and I think that is somewhat telling. So I will – I guess I haven't reserved any time, so if you want me back, I'd be glad to. Thank you. Thank you. Good afternoon. My name is Terry Shea. May it please the Court. Appearing for the Commissioner of Social Security Council. This case has to do, basically, with credibility. That's the major factor here. Plaintiffs' counsel has said a number of things or plaintiffs made a number of claims that his doctors believed him, and otherwise they wouldn't have continued to give him drugs. The whole idea with a treating physician being employed to cure is that he or she works with their patient, and they together go toward the same goal as to mitigate or cure the illness or impairment. What each of these physicians found was they couldn't work with the claimant because he did not abide by their advice. The idea that they scolded him makes light of the fact that they were saying, frankly, you know, you are addicted. You need to follow the prescriptions as they are prescribed and not take two times as much or three times as much. The idea that they believed him is belied by the fact that they noted drug-seeking behaviors. He started coming in and asking for prescriptions after two weeks. He came in and said he lost his prescriptions. His wife washed it in the washing machine. His mother washed it in the washing machine. Now, all these kinds of things came up over and over again. And one doctor even said to him, if you run out of your pills early, you are not to continue to call my office six times a day demanding treatment. Just don't do that. That sounds like a bit more than a scolding to me. And also the fact that each of these doctors continued to try to work with him over long periods of time and then stopped because it became apparent to them that he would not comply with their advice. And they made the judgment that, you know, he had pain. Sure, they wouldn't have given him pills to begin with. And the judge doesn't, the ALJ does not say he did not have pain. He just says it looks like he doesn't have pain to the degree he claimed, because he didn't try to work with his doctors. At the same time, he continued to work. He had worked as a drywaller for at least six or seven months after the day he became disabled. That's very heavy work. After that, he went and got his real estate license and began selling houses. After that, he went back and was going to study to be an appraiser because it was a better financial gain for him to do that. Now, there's a big change, and I don't think there's any question that he couldn't continue to do drywalling. But there are many light types of work that he could do. Is there any dispute that he was in pain? I don't think the ALJ ever disputed that he was in pain. He basically said he wasn't disabled by his pain, or you could not take his testimony of his pain to explain how it was much more than the physical findings. The reason I ask is because the hypothetical didn't include any mention of his pain, his ongoing pain. Okay. You know, basically, when you talk about pain or you talk about credibility, you look at whether or not there is any kind of finding of physical impairment that could cause any level of pain. Right. And then you go beyond that and say, okay, can we believe this person? But the ALJ talked about pain specifically or not. He was talking about the claimant's credibility and the fact that as you move from doctor to doctor, at least for the first three sets, he didn't advise the new doctor that he had been fired from the old practice. It's all about credibility. I'll concede that he appears to have been a really bad patient. I'm just trying to figure out whether he was disabled. And that's why, when I look to the hypothetical, I'm trying to make sure that the correct hypothetical that encompassed all of the findings was put to the vocational expert. Well, when the ALJ decides what the residual functional capacity is, he weighs the testimony and the medical opinions to figure out what the limitations are. I don't think the ALJ has ever in the residual functional capacity talked about the degrees of pain. They make that decision before they get there or in coming up with a residual functional capacity, and they don't say generally to the expert, now, he's going to have pain, but. Well, it seems to me to be a fair point to make in a situation where there isn't a treatment option for this guy. The records are pretty clear, I think, that the surgeon said there isn't a surgical intervention. He's got this ongoing pain because he had severe, what the physicians thought was severe, disc disease, and then, you know, we've talked a lot about this attendant addiction. I don't think there's any question about that. The question I have is, so now what? What can he do, given that he's got ongoing pain? And that's why it seemed to me to be fair. But let me ask you another question, if I could. What evidence in the record supports the finding that was in the ALJ's record that the claimant could occasionally stoop, kneel, crouch, or crawl? Where does that come from? Well, generally, it comes from medical assessments or that whatever indication there is in the record that somebody has to change positions frequently. I don't remember off the top of my head whether that came from the claimant saying, I can't, you know, sit down all day, I can't stand up all day, I have to move from position to position. So basically, that appears to come from the claimant's testimony, as reasonable from the initial diagnosis of the disc disease. Thank you. The government's position, basically, is that this gentleman, even though he's not the typical addict that you see, that is intended to be covered by the drug and alcohol preclusion, he's somebody who went from doctor to doctor. He's basically shopping for another doctor who will continue to give him pills. And he went from Vicodin to OxyContin to Methadone, which are all very heavy-duty drugs to alleviate pain. But because the doctors could not get him to go along with their suggestions, they couldn't, you know, get to a point where they could mitigate or alleviate the pain enough. He was found to be not a surgical candidate, and that there was no disc herniation, which is the thing that you would normally get surgery for. There was where the disc is pushing on a nerve, and that causes intractable pain. They were taking his reports and then trying to work with him based on his own reports. They didn't make findings that he would continue to be in pain. And, in fact, several doctors noted he has no trouble walking. He has no trouble getting on and off the examination table. Yet, he says he's in intractable pain. They didn't make that comparison, but that is what he said every time he came in to see his doctors. He's still in pain. It has not changed. Kagan, where did they say he has no trouble walking or getting on and off the exam table? Oh, that's a couple of places in the record. Let me see if I can find that. Thank you. Anything else? I don't have anything else. I will ‑‑ okay. I found one of them. Basically, excerpts of record 183. Thank you. But there are others. I could put it together for you, if you like. But if there are no further questions, that is all I have. Thank you. All right. I'm going to make a brief comment. We'll give you a few seconds. You want a few seconds? We want you to leave here happy. Thank you. First off, we have this strange conflict between a ruling that says if the client goes and seeks and seeks and persists and persists and seeks and goes from doctor to doctor, that embraces and enhances credibility. And yet in this case, we hear from defendant that because he went from doctor to doctor to try to get an answer for his pain, he's not credible. None of these doctors have said you're gaming me, I totally disbelieve you. They basically said we're frustrated with you, you're violating our office policy, we're not going to treat you anymore. You're not a good patient. You've exactly found that, stated that, Your Honor. The other thing is the only objective thing that was done to quantify Mr. Koepke's physical capacities was this PCE evaluation. That's it. And if Judge Madden or the ALJ then decided that the four to five-hour-a-day maximum was inappropriate and just came up with his own residual functional capacity with eight hours a day, where did he come up with it? I mean, there's no substantial evidence of clear and of legitimate and specific reasoning for that or clear and convincing evidence of that. This PCE was used apparently by Judge by the ALJ to come up with his physical capacities, and yet he doesn't explain why he really rejects that. And the confusion is even compounded by the fact that you note that Judge Hogan sees a less than eight-hour-a-day quantification of time for work or an eight-hour-a-day workday, and Judge Hogan, I think it was just slipped. He went ahead and said, well, because the judge said he could sit, stand, and walk for six hours in an eight-hour day, and he relied on that, I'll affirm the order. So, again, I would – Judge Hogan's a wonderful man. I don't know why that error occurred there, but there's an inconsistency there that at least shows confusion as to this PCE that would subject the case to remand. I think, however, that if Mr. Koepke's testimony is credited, then you have to credit the PCE, which was based on Mr. Koepke's symptoms. Again, I do want you to note as well that in the physical capacities evaluation, the evaluator found good correlation between my client's symptoms and his capacities. There might have been – there was some mention in there of something, but if you look at the conclusions, they found good correlations. There's no explanation in the record as to why this physical capacities evaluation wasn't good, why somehow another set of – We go – we go through all that stuff. Okay. This is what I got on your guy. Yeah. Okay. Well, thank you. Thicker than yours. Pardon me, Your Honor? Thicker than yours. Yes. Okay. Thank you, Your Honors. It's a privilege being in this beautiful, restored court. I have no charge. Thank you. All right. Bookstore Inc. versus Leonard.
judges: Goodwin, Pregerson, Christen